UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JAMES D. JULIA, INC., n/k/a     )
JDJ DISSOLUTION, INC.,       )
                             )
         Plaintiff,      )
                             )
        v.             )     No. 1:21-cv-00025-JAW
                             )
DAN MORPHY AUCTIONS, LLC,   )
                             )
        Defendant.     )

## ORDER ON MOTION TO DISMISS

This diversity case concerns a contract dispute between two auction houses. In 2015, the parties executed a referral agreement concerning advertising, toys, and dolls auctions, and two years later, the parties executed another agreement whereby the defendant essentially purchased the plaintiff's business. In December of 2020, the plaintiff sued the defendant for breaching the 2015 referral agreement. Now, the defendant moves to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6), arguing the parol evidence rule bars the plaintiff's claim. The Court grants the motion to dismiss because the 2017 agreement is a fully integrated later-in-time agreement concerning the same subjects as the 2015 agreement. The Court concludes that the plaintiff failed to state a claim upon which this court may grant relief because the 2017 agreement discharged the 2015 agreement.

## I. PROCEDURAL HISTORY

On December 1, 2020, James D. Julia, Inc., now known as JDJ Dissolution, Inc. (JDJ), filed a one-count complaint for breach of contract against Dan Morphy

Auctions, LLC (Morphy), in Somerset County Superior Court. *Notice of Removal*, Attach. 1, *Compl.* (ECF No. 1). On January 19, 2021, Morphy removed the action to the United States District Court for the District of Maine. *Notice of Removal* at 1-5. On February 15, 2021, JDJ filed an amended complaint. *Pl.'s First Am. Compl.* (ECF No. 12) (*Am. Compl.*).

On February 26, 2021, Morphy moved to dismiss JDJ's Amended Complaint for failure to state a claim. *Def.'s Mot. to Dismiss Pl.'s First Am. Compl. for Failure to State a Claim* (ECF No. 15) (*Def.'s Mot.*).[1] On March 19, 2021, JDJ responded in opposition. *Opp'n to Def.'s Mot. to Dismiss Pl.'s First Am. Compl.* (ECF No. 20) (*Pl.'s Opp'n*). On April 1, 2021, Morphy replied. *Def.'s Reply Br. in Supp. of Its Mot. to Dismiss Pl.'s First Am. Compl. for Failure to State a Claim* (ECF No. 21) (*Def.'s Reply*).

On May 11, 2021, the Court ordered JDJ to clarify its position as to whether the Court may consider the documents attached to Morphy's motion to dismiss when deciding that motion. *Order* at 1-2 (ECF No. 25). On May 18, 2021, JDJ filed a nuanced response. *Pl. JDJ Dissolution, Inc.'s Resp. to Ct. Order of May 11, 2021* at 1-2 (ECF No. 26). JDJ affirmed that the attached documents are authentic, and the Court may properly consider them without converting this motion to a motion for summary judgment. *Id.* At the same time, JDJ did not concede that the Court should consider the documents because, in its view, the factual allegations in the Amended

---

[1] This is Morphy's second motion to dismiss. On January 26, 2021, Morphy moved to dismiss for failure to state a claim, or, alternatively, for a more definite statement of JDJ's claims. *Def.'s Mot to Dismiss for Failure to State a Claim, or, Alternatively, for a More Definite Statement* (ECF No. 9). However, on February 15, 2021, JDJ filed its First Amended Complaint, *Pl.'s First Am. Compl.* (ECF No. 12), and on February 22, 2021, Morphy moved to withdraw its motion to dismiss as moot. *Mot. to Withdraw Mot. to Dismiss as Moot* (ECF No. 13). That same day, the Magistrate Judge granted Morphy's motion to withdraw. *Order* (ECF No. 14).

Complaint do not depend on the documents nor are the documents central to a claim or defense. *Id.*

## II. THE FACTS

When deciding a motion to dismiss, a court "accept[s] all well-pleaded facts in the complaint as true." *Gilk v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 36 (1st Cir. 2009)). A court also "construe[s] all reasonable inferences in favor of the plaintiff . . .." *Sanchez*, 590 F.3d at 41 (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) and citing *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008)). Here, the Court draws the relevant facts from the First Amended Complaint. As the Court will explain, despite JDJ's reservations, the Court concludes that it may also consider the 2015 Agreement and 2017 Agreement because those documents are central to the allegations in JDJ's complaint and neither party contests their authenticity. *Schatz v. Republican Leadership Comm.*, 669 F.3d 50, 55-56 (1st Cir. 2012).

### A. The Parties and Their 2015 Referral Agreement

JDJ is a Maine corporation with a principal place of business in Fairfield, Maine. *Am. Compl.* ¶ 1. JDJ filed articles of dissolution on December 5, 2018 effective December 31, 2018. *Id.* Before dissolution, JDJ was an auction house. *Id.* ¶¶ 6-7. Prior to December 14, 2017, it conducted both private and public auctions in various product categories, including but not limited to "rare firearms, lamps, glass, fine jewelry, fine arts, Asian, and antiques." *Id.* ¶ 6. Before June 22, 2015, JDJ also

conducted auctions which were known and promoted as auctions for "Advertising, Toys, and Dolls," or "ATD" auctions. *Id.* ¶ 7. The ATD auctions primarily sold toys, dolls, stuffed bears, salesman samples, patent models, coin operated machines, music boxes, advertising posters, and signs. *Id.* ¶ 8. JDJ also maintained a separate mailing list of persons who consigned or purchased ATD items at its auctions. *Id.* ¶ 9.

Morphy is another auction house. *Id.* ¶ 2. Morphy is a limited liability company with its principal place of business in Denver, Pennsylvania. *Id.* ¶ 2. On June 22, 2015, Morphy and JDJ entered into an agreement (the 2015 Agreement) relating to ATD auctions and JDJ's ATD mailing list. *Id.* ¶ 10. Under the 2015 Agreement, JDJ agreed it would not conduct ATD auctions for five years, would provide Morphy with its ATD mailing list, and would refer consigners who contacted JDJ about selling ATD items at auction to Morphy. *Id.* ¶¶ 11-13. In exchange, Morphy promised to pay JDJ a "finder's fee" for JDJ-referred items that sold at auction. *Id.* ¶ 14. If the total ATD items JDJ referred to Morphy through JDJ's mailing list or word-of-mouth referrals sold at auction for more than $5,000,000, JDJ would receive a finder's fee equal to five percent of the collected hammer price in excess of $5,000,000. *Id.* ¶ 15. Morphy also agreed to pay JDJ $100,000 upon execution of the 2015 Agreement, and another $150,000 on or before November 1, 2015. *Am. Compl.*, Attach. 1, *Agreement* at 4 (*2015 Agreement*).

Morphy had other contractual duties. The 2015 Agreement required Morphy to provide JDJ with a record of all items JDJ referred, the selling price of each item,

and the finder's fee due to JDJ. *Am. Compl.* ¶ 16. Morphy also agreed to provide an accounting of the sale price of any items JDJ referred and the finder's fee due to JDJ within thirty days after the end of the calendar month in which the item sold at auction. *Id.* ¶ 17. In addition, Morphy promised to pay JDJ its finder's fee within thirty days after the last day of the calendar month in which it collected the hammer price on a JDJ-referred ATD item. *Id.*

The 2015 Agreement provides that it "shall be construed under and in accordance with the internal laws of the State of Maine, without resort to its conflicts of laws principles and applicable federal law." *2015 Agreement* at 6.

**B.    ATD Referrals and Sales Before December 14, 2017**

Before December 14, 2017, JDJ regularly and consistently referred leads to Morphy about individuals who wanted to sell ATD items. *Am. Compl.* ¶ 18. It referred at least forty ATD leads to Morphy during this time. *Id.* ¶ 19. In particular, JDJ referred Michael Worley to Morphy prior to December 14, 2017. *Id.* ¶ 20. Mr. Worley owned a collection of ATD items and non-ATD items valued at many millions of dollars (the Worley Collection). *Id.* ¶ 21. In total, the Worley Collection was valued between $25,000,000 and $30,000,000. *Id.* ¶ 22.

Prior to December 14, 2017, Morphy sold a portion of the Worley Collection and collected over $5,000,000 from the sale of the items. *Id.* ¶¶ 23-24. For instance, at an October 2016 auction, Morphy sold portions of the Worley Collection and collected more than $1,600,000, much of which resulted from selling Worley items that JDJ

referred to Morphy.  *Id.* ¶ 25.  At auctions in January and June of 2017, Morphy again sold items from the Worley Collection and collected more than $6,000,000.  *Id.* ¶ 26.

JDJ also referred John Deeter of Deeter & Guyette, a decoy auction company, to Morphy.  *Id.* ¶¶ 27-28.  Prior to December 14, 2017, Mr. Deeter contacted JDJ about a collector who had a mechanical bank collection to consign, which involved ATD items (Deeter Items).  *Id.* ¶ 29.  When Mr. Deeter later contacted Morphy, he told Morphy that JDJ referred him.  *Id.* ¶ 30.  Prior to December 14, 2017, Morphy sold the Deeter Items that JDJ referred and collected approximately $1,000,000 from those sales.  *Id.* ¶ 31.  Prior to December 14, 2017, in addition to the Worley Collection and Deeter Items, Morphy sold items on consignment from other individuals JDJ referred to Morphy or from JDJ's ATD mailing list.  *Id.* ¶ 32.

Before December 14, 2017, Morphy collected a hammer price of more than $5,000,000 on JDJ-referred items and items received on consignment from individuals on JDJ's ATD mailing list.  *Id.* ¶ 33.  By themselves, the items from the Worley Collection accounted for more than $5,000,000 in hammer price.  *Id.* ¶ 34. However, Morphy never provided JDJ with an accounting relating to the Worley or Deeter items sold before December 14, 2017.  *Id.* ¶ 35.  Moreover, Morphy never provided any accounting to JDJ relating to other JDJ-referred items or items Morphy received on consignment from members of JDJ's ATD mailing list prior to December 14, 2017.  *Id.* ¶ 36.  To date, Morphy has never paid JDJ a finder's fee on the Worley Collection, the Deeter Items, other items sold on consignment after a JDJ-referral, or any sales from persons on JDJ's ATD mailing list.  *Id.* ¶¶ 37-38.

## C.     ATD Referrals On or After December 14, 2017

On or after December 14, 2017, JDJ continued to refer leads to Morphy about individuals with ATD items and Morphy sold such items. *Id.* ¶¶ 39-40. During the same time, Morphy also sold ATD items received on consignment from individuals on the ATD mailing list. *Id.* ¶ 41. However, Morphy has never provided any accounting or paid any finder's fee to JDJ relating to ATD items Morphy sold following JDJ referrals or consignment from individuals on JDJ's ATD mailing list. *Id.* ¶¶ 42-43. The sales of these items occurred more than thirty days before JDJ filed the Amended Complaint. *Id.* ¶ 44.

## D.     Morphy Breaches the 2015 Agreement

JDJ fully performed its obligations under the 2015 Agreement by providing its ATD mailing list to Morphy and referring at least forty leads relating to other items, including the Deeter Items and Worley Collection. *Id.* ¶ 47. JDJ contends Morphy breached the 2015 Agreement by failing to pay JDJ a finder's fee equal to five percent of the collected hammer price in excess of $5,000,000 for the JDJ-referred items Morphy sold at auction prior to December 14, 2017. *Id.* ¶ 48. JDJ also contends Morphy breached the contract by failing to pay a finder's fee for items sold after December 14, 2017. *Id.* ¶ 49. In addition, Morphy has never provided JDJ with an accounting of all items referred by JDJ, the selling price of all such items, and the fees due with JDJ within thirty days after the end of the calendar month in which Morphy sold the items at auction. *Id.* ¶ 50. As a result, JDJ has been damaged. *Id.* ¶ 51.

**E.    The 2017 Agreement and James D. Julia's Consulting Agreement**

On December 6, 2017, JDJ and Morphy executed a second contract. *Def.'s Mot.*, Attach. 1, *Purchase Agreement* at 2 (*2017 Agreement*).  The closing date was December 14, 2017.  *Id.* at 7.  The 2017 Agreement confirms that JDJ is a business that conducts auctions of items including, but not limited to, rare firearms, lamps, glass and fine jewelry and fine arts, and antiques.  *Id.* at 1.  It further provides that Morphy intended to buy some of JDJ's assets, including its intangibles, the name James D. Julia, Inc., all business records, all of JDJ's goodwill, its customer credits, its consignment contracts, and its restrictive covenants.  *Id.* at 1-2.

The 2017 Agreement contains the following integration clause:

> 8.6 <u>Entire Agreement</u>.  This Agreement, including the other documents referred to herein which form a part hereof or any other written agreements that the parties enter into pursuant to or relating to the transactions contemplated by this Agreement, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and therein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.  All exhibits and schedules referred to herein and attached hereto or to be attached are incorporated herein by reference.

*Id.* at 21.  The 2017 Agreement resolves that any disputes about its validity or the parties' obligations shall be governed by Pennsylvania law "applicable to contracts made and to be performed entirely in such state []without giving effect to the conflicts of laws provisions thereof." *Id.* at 20 (emphasis removed).  In addition, the 2017 Agreement requires that any action to enforce the parties' rights and obligations under the agreement may only be commenced and maintained "in any

court of competent jurisdiction located in the state of Delaware." *Id.* (emphasis removed).

In December 2017, Morphy also executed a consulting and restrictive covenant with James D. Julia. *Id.* at 44 (the Consulting Agreement). In addition to establishing Mr. Julia's duties for a consultancy with Morphy, the agreement required Mr. Julia to, "on a timely basis, refer any and all parties and entities, who contact him related to standard consignments, any former referrals, exclusively to [Morphy]." *Id.* at 46. The Consulting Agreement contained the following provision concerning merger, waiver, and amendment:

> Complete Agreement; Waiver; Amendment. This Agreement constitutes the entire Agreement between the parties and supersedes all prior negotiations, understandings and agreements of any nature whatsoever, whether oral or written, with respect to the subject matter hereof. No amendment, waiver or discharge of any provision of this Agreement shall be effective against any party, unless that party shall have consented thereto in writing.

*Id.* at 49. The Consulting Agreement further provided that Pennsylvania law governed and that "[e]ach party irrevocably submits to the exclusive jurisdiction and venue of the federal and state courts located in Delaware in any legal suit, action, or proceeding arising out of or based upon this Agreement or the Services provided hereunder." *Id.* at 49-50.

## III. THE PARTIES' POSITIONS

### A. Dan Morphy Auctions, LLC's Motion to Dismiss

Morphy urges the Court to dismiss JDJ's Amended Complaint for failure to state a claim. *Def.'s Mot.* at 5. According to Morphy, the 2017 Agreement "redefined

the rights and obligations between the parties" because "Morphy purchased outright all of [JDJ's] contact lists, leads, and potential referral information for every business division." *Id.* at 6. Therefore, Morphy concludes the "parol evidence rule now bars [JDJ's] reliance on the prior 2015 Agreement" and JDJ "cannot state a cause of action for a breach of the 2015 Agreement as a matter of law." *Id.* at 7.

Morphy contends Pennsylvania law governs this case because JDJ's claims arise under the 2017 Agreement, rather than the 2015 Agreement. *Id.* at 7 n.5. However, Morphy acknowledges that even if Maine law applied, "the analysis and conclusion would not be altered" because Maine and Pennsylvania apply the parol evidence rule in the same manner. *Id.* Applying Pennsylvania law, Morphy submits that "evidence of a prior written agreement involving the same subject matter is inadmissible to explain or vary the terms of" a subsequent contract. *Id.* at 7. Morphy argues that the parol evidence rule "is a substantive bar to asserting a claim based on a prior agreement." *Id.* (citing *Creative Pultrusions, Inc. v. Cooper B-Line, Inc.*, No. 3:18-cv-256, 2019 U.S. Dist. LEXIS 195668, at *7-13 (W.D. Pa. Nov. 12, 2019)).

Morphy says the Court should apply the parol evidence rule and prevent JDJ from suing for breach of the 2015 Agreement. *Id.* at 8. It asserts the 2017 Agreement expressly "supersedes all prior agreements and understandings between the parties with respect to such subject matter." *Id.* (quoting the 2017 Agreement). Morphy raises two supporting contentions. *Id.* at 8-10. First, it contends the 2017 Agreement "embraces the issues contained by the 2015 Agreement" because the 2015 Agreement created a temporary referral arrangement concerning the ATD business line and

Morphy purchased the ATD business when it purchased "substantially all of [JDJ's] assets" in 2017. *Id.* at 9-10 (emphasis removed). Morphy concludes its 2017 purchase of JDJ's customer information, lists of suppliers and vendors, records, prospect lists, pricing and cost information "[i]mplicitly . . . included the customer lists and referral information related to the ATD business line." *Id.* at 10. Second, Morphy draws the Court's attention to the 2017 Agreement's non-compete provision where JDJ "agreed not to compete with Morphy and would refer all potential business to Morphy." *Id.* It concludes the 2017 Agreement supersedes the 2015 Agreement because they both "encompass the acquisition of contact information and the referral of potential consignment leads, including those for ATD items." *Id.*

Morphy's final argument asks the Court to consider the context of the 2017 Agreement. Morphy claims context suggests the parties intended the 2017 Agreement "to be the full and complete agreement regarding any and all outstanding issues between [them]." *Id.* It reminds the Court that it was "purchasing [JDJ's] entire business" and urges JDJ's claim that "the parties still had rights and obligations under the 2015 Agreement is not only contrary to the parol evidence rule, but it would be illogical given the circumstances of the Purchase Agreement and [JDJ's] subsequent dissolution." *Id.* at 10-11. Morphy draws an analogy between JDJ's conduct and that of "a landlord seeking to collect rent under the lease agreement after selling the property to his tenant." *Id.* It rejects JDJ's claim, urging that the 2017 Agreement "agreed on a final purchase price for all of [JDJ's] assets" and that "no allowance was made to collect allegedly unpaid fees under the 2015

Agreement." *Id.* at 11. Morphy therefore concludes "the parol evidence rule bars [JDJ] from seeking to be paid again based on a superseded agreement." *Id.*

### B.      James D. Julia, Inc.'s Opposition

JDJ presents two arguments in opposition to the motion to dismiss. *Pl.'s Opp'n* at 1-2. First, JDJ argues its claims against Morphy for breaching the 2015 Agreement accrued before the parties executed the 2017 Agreement. *Id.* at 1. JDJ says "the 2017 Purchase Agreement cannot implicitly subsume claims actually accrued prior to its existence." *Id.* at 1-2. Second, JDJ argues the 2017 Agreement does not relate to the ATD auctions, ATD mailing list, or ATD referrals and sales because "[t]he ATD Auction Division was sold to Morphy pursuant to the terms and conditions of the 2015 ATD Contract." *Id.* at 2. Thus, JDJ concludes Morphy cannot use the 2017 Agreement "as a shield" to JDJ's breach of contract claims that accrued after December 2017. *Id.*

On the first issue, JDJ contends "[t]here is no support in the law that a boilerplate integration clause bars a cause of action that accrues *prior* to the execution of a fully-integrated agreement." *Id.* at 6 (emphasis in original). JDJ observes the cases Morphy cites in support of applying the parol evidence rule all concern causes of action that accrued after the contracting parties' subsequent agreements superseded their earlier agreements. *Id.* JDJ suggests Morphy "conflates the legal concepts of integration and *waiver*" and urges that it did not knowingly and intentionally waive its rights under the 2015 Agreement by entering into the 2017 Agreement. *Id.* at 6-7. (emphasis in original).

In support of its waiver argument, JDJ relies on language from the 2017 Agreement, which states:

> The consummation of the transactions described herein by any party shall not constitute a waiver of any known breaches of any other party's representations, warranties, obligations, agreements, or covenants unless the same are expressly waived in writing.

*Id.* at 7 (quoting *2017 Agreement* at 21) (emphasis removed). JDJ therefore contends the plain language of the 2017 Agreement preserves its rights to sue Morphy for breaching the 2015 Agreement. *Id.* Because waiver is an affirmative defense under Federal Rule of Civil Procedure 8(c), JDJ concludes it is procedurally improper to dismiss its pre-2017 Agreement claims that Morphy breached the 2015 Agreement. *Id.* at 8. JDJ urges Maine law controls whether it waived its rights under the 2015 Agreement. *Id.* at 7 n.1. However, to the extent that the Court finds the 2017 Agreement's choice of law provision controls, JDJ asserts Pennsylvania law on waiver "is in accord" with Maine law such that the result of the legal analysis will be the same. *Id.*

JDJ's second argument against dismissal is that the 2017 Agreement did not supersede the parties' 2015 Agreement. *Id.* at 8. Although JDJ agrees with Morphy that the 2017 Agreement contains an integration clause, it insists the parol evidence rule is inapplicable because the agreements do not concern the same subject matter. *Id.* at 8-9. According to JDJ, this case is governed by the "collateral agreement rule" which provides that a later-in-time fully integrated agreement between two parties does not supersede "an entirely separate and distinct agreement between the same

parties." *Id.* at 10 (quoting *Brennan v. Carvel Corp.*, 929 F.2d 801, 807 (1st Cir. 1991)).

More specifically, JDJ contends the 2015 Agreement effectively sold its ATD business to Morphy in exchange for a finder's fee. *Id.* In 2017, JDJ says it "entered into a separate and distinct contract" concerning the sale of the remainder of its business. *Id.* at 10-11. JDJ urges "as a matter of logic" that the 2017 Agreement could not have possibly conveyed the ATD business to Morphy because Morphy already owned JDJ's ATD business under the 2015 Agreement. Thus, JDJ concludes "the integration clause in the 2017 Purchase Agreement has no effect on Morphy's breach of its contractual obligations under the 2015 ATD Agreement." *Id.* at 12.

### C.     Dan Morphy Auctions, LLC's Reply

Morphy's reply raises two arguments. First, it contends the "2017 Purchase Agreement encompassed all of the ATD assets and goodwill that were subject to the five-year 2015 Agreement and superseded the rights, obligations, and remedies between [JDJ] and Morphy." *Def.'s Reply* at 2. It observes that JDJ's Amended Complaint does not allege JDJ sold its ATD division to Morphy in 2015. *Id.* Morphy represents it "did not purchase the assets and goodwill of [JDJ's] ATD division in 2015." *Id.* Instead, Morphy claims the 2017 Agreement replaced the 2015 Agreement "when Morphy purchased essentially all of [JDJ's] assets and goodwill, regardless of the product category." *Id.* at 3. Morphy also stresses that the "2017 Purchase Agreement did not exclude the ATD assets" and notes the 2017 Agreement uses broad language and that no "express term" excludes ATD assets. *Id.* at 3-4.

Morphy's second point is that waiver "is not at issue in the Motion to Dismiss." *Id.* at 6. Instead, the issue is whether the 2017 Agreement supersedes the 2015 Agreement. *Id.* Morphy submits the 2017 Agreement supersedes because "[i]t is hornbook law that when parties execute a subsequent, integrated agreement, the parol evidence rule discharges all prior agreements." *Id.* at 6-7. Thus, Morphy asks the Court to grant its motion to dismiss. *Id.* at 7.

## IV. LEGAL STANDARD

Rule 8(a) of the Federal Rules of Civil Procedure requires that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). According to the United States Supreme Court, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "sufficient facts to show that he has a plausible entitlement to relief." *Sanchez*, 590 F.3d at 41 (citing *Iqbal*, 556 U.S. at 678). Deciding a motion to dismiss under Rule 12(b)(6) is a two-step analysis. *Schatz*, 669 F.3d at 55. First, a court "isolate[s] and ignore[s] statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Id.* Second, a court "take[s] the

complaint's well-pled . . . facts as true, drawing all reasonable inferences in the pleader's favor, and see[s] if they plausibly narrate a claim for relief." *Id.*

## V.    DISCUSSION

Before analyzing Morphy's motion to dismiss on the merits, the Court must address two threshold issues. First, the Court determines the scope of the record it may consider when ruling on Morphy's 12(b)(6) motion. Second, the Court addresses a choice-of-law issue. After resolving these issues, the Court applies the parol evidence rule and concludes that the 2017 Agreement is a fully integrated agreement between the parties concerning the same subject matter as their 2015 Agreement. Therefore, the 2017 Agreement superseded the 2015 Agreement and the Court grants Morphy's motion to dismiss for failure to state a claim.

### A.    Documents Outside the Pleadings

Ordinarily, a court ruling on a motion to dismiss may only consider whether the factual allegations within the four corners of the plaintiff's complaint state a plausible claim for relief. *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 8 (1st Cir. 2020). One exception, relevant here, occurs "when, as now, a complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). In addition, a court may also consider "facts susceptible to judicial notice and

concessions in [the] plaintiff's response to the motion to dismiss." *Schatz*, 669 F.3d at 55-56 (citation and quotation marks omitted).

Here, whether JDJ may state a claim against Morphy for breaching the 2015 Agreement necessarily depends upon whether the 2017 Agreement discharged the 2015 Agreement. JDJ admits the 2017 Agreement is authentic; however, JDJ's Amended Complaint does not reference or incorporate it. *Pl. JDJ Dissolution, Inc.'s Resp. to Ct. Order of May 11, 2021* at 1-2. The Court concludes that it may properly consider the attachments to Morphy's motion when ruling on the motion to dismiss because overcoming the parol evidence rule is essential to JDJ's claims. *See Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135-36 (1st Cir. 2017) (considering a contract of undisputed authenticity that was central to the plaintiff's claims on the posture of a motion to dismiss when the contract answered the "determinative" question); *Diva's Inc. v. City of Bangor*, 411 F.3d 30, 37-38 (1st Cir. 2005) (affirming a district court's reliance on a settlement agreement attached to the defendant's motion to dismiss because the plaintiff's complaint purported to state a claim under the agreement and whether the defendants "breached the settlement agreement [was] dependent on the scope of the settlement agreement"); *Beddall*, 137 F.3d at 17 ("Any other approach would seriously hinder recourse to Rule 12 motions, as a plaintiff could thwart the consideration of a critical document merely by omitting it from the complaint").

### B.    Choice of Law

A federal court sitting in diversity jurisdiction must apply the choice-of-law rules of the state in which it sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941).  In Maine, "[w]hen a contract contains a choice of law provision, [Maine law] will generally interpret the contract under the chosen state's laws." *Stenzel v. Dell, Inc.*, 2005 ME 37, ¶ 7, 870 A.2d 133, 139.  Therefore, the Court interprets the 2015 Agreement under Maine law and interprets the 2017 Agreement under Pennsylvania law.

There is a slightly more challenging choice-of-law question.  The parties dispute whether this case arises under the 2015 Agreement, which applies Maine law, or the 2017 Agreement, which applies Pennsylvania law.  The difficulty is that this choice-of-law question embraces the ultimate issue in this case: whether the 2017 Agreement supersedes the 2015 Agreement.  The first step in a choice-of-law analysis is to "determine whether there is a conflict between the substantive laws of the interested jurisdictions." *Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 29 (1st Cir. 1997).  There is no conflict when "the resolution of a choice-of-law determination would not alter the disposition of a legal question." *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005); *Royal Bus. Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1064 (1st Cir. 1991) (saying that choice of law is "unnecessary" where the "result will not vary").

Fortunately, under this rubric, the Court need not decide whether Maine or Pennsylvania law applies because the laws of each state are congruent on the issues

before the Court. Despite their dispute about which jurisdiction's law applies, the parties agree Maine and Pennsylvania apply substantially the same approaches to the parol evidence rule and waiver. *Def.'s Mot.* at 7 n.5; *Pl.'s Opp'n* at 7 n.1, 9 n.2, 11 n.3. They are correct. *See Brown Dev. Corp. v. Hemond*, 2008 ME 146, ¶ 13, 956 A.2d 104, 108 (explaining Maine's approach to the parol evidence rule); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436-37 (Pa. 2004) (explaining Pennsylvania's approach to the parol evidence rule); *see also Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 26, 980 A.2d 1270, 1277 (describing waiver as "a voluntary or intentional relinquishment of a known right"); *Commonwealth ex rel. Corbett v. Griffin*, 946 A.2d 668, 679 (Pa. 2008) ("A waiver in law is the act of intentionally relinquishing or abandoning some known right, claim or privilege") (citation omitted). The Court therefore declines to resolve the choice-of-law issue because Maine and Pennsylvania law are not materially different. *See Prime Tanning Co., Inc. v. Liberty Mut. Ins. Co.*, 750 F. Supp. 2d 198, 210-11 (D. Me. 2010) (explaining there is no need to perform a choice-of-law analysis when the differences between potentially applicable law are immaterial to the outcome of the case).

For ease of reference, the Court cites Pennsylvania law throughout this order, but is mindful that the result would be the same under Maine law.

### C.    The Parol Evidence Rule

The Court turns to the merits.

#### 1.    Legal Standard

"Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement." *Yocca*, 854 A.2d at 436 (quoting *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)); *Sokoloff v. Strick*, 172 A.2d 302, 348-49 (1961) (characterizing the parol evidence rule as substantive). Moreover, "[a]ll preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence." *Yocca*, 854 A.2d at 436 (quoting *Gianni*, 126 A. at 792). Thus, "[o]nce a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract." *Yocca*, 854 A.2d at 436-37.

Whether the parol evidence rule applies is a question of law that a court may properly resolve at the pleadings stage. *See Creative Pultrusions,* 2019 U.S. Dist. LEXIS 195668, at *11 (citing *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 994-95 (3d Cir. 1987)). To determine whether the parol evidence rule discharges a prior contract, a court must first decide whether the parties formed an integrated contract. *Yocca*, 854 A.2d at 436.

Integration may be complete or partial. *McGuire v. Schneider*, 534 A.2d 115, 118 (Pa. Super Ct. 1987) (citing RESTATEMENT (SECOND) OF CONTRACTS

§§ 209(2), 210(3)); 1 CORBIN ON PENNSYLVANIA CONTRACTS § 25.02. A completely integrated contract is the complete and exclusive agreement between the parties. 1 CORBIN ON PENNSYLVANIA CONTRACTS § 25.02. (citing RESTATEMENT (SECOND) OF CONTRACTS § 210(1)). Partially integrated agreements contain less than the parties' entire agreement. *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 210(2)). Generally, an unambiguous integration clause establishes that an agreement is fully integrated. *See Yocca*, 854 A.2d at 436 (explaining that if a contract appears to be fully integrated "it is conclusively presumed" to be "the whole engagement of the parties" and noting "[a]n integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution"); *McGuire*, 534 A.2d at 117 ("The effect of an integration clause is to make the parol evidence rule particularly applicable").

If a court determines an agreement is integrated, it proceeds to the second step of the parol evidence rule analysis and considers whether the integrated agreement concerns the same subjects as an earlier agreement between the parties. *Yocca*, 854 A.2d at 436-37. When the two agreements concern the same subjects, the later-in-time agreement discharges the parties' rights and duties under the earlier agreement. *Id.* at 436; *see Atul K. Amin Family, L.P., v. Steward Easton Hosp., Inc.*, No. 5:20-cv-04161-JMG, 2021 U.S. Dist. LEXIS 95612, at *8-10 (E.D. Pa. May 19, 2021) (concluding two agreements pertained to the same subject matter

when each agreement dictated the terms governing the defendant's lease of the same two suites).

### 2.    Application

Here, the Court must first determine whether the 2017 Agreement is integrated.    The meaning of an unambiguous contract is a question of law. *Commonwealth ex rel. Shapiro v. UPMC*, 208 A.3d 898, 909-10 (Pa. 2019).    In Pennsylvania, the "cardinal rule" of contract interpretation is to "ascertain the intent of the contracting parties."  *Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 463 (Pa. 2015).  Pennsylvania law interprets contracts "in accordance with the terms of the agreement as manifestly expressed, and the accepted and plain meaning of the language used . . .." *SLT Holdings, LLC v. Mitch-Well Energy, Inc.¸* No. 6 WAP 2020, 2021 Pa. LEXIS 1849, at *8 (Pa. Apr. 29, 2021) (citation and quotation marks omitted).

The Court's integration analysis begins and ends with the 2017 Agreement's unambiguous text.  The 2017 Agreement contains the following integration provision:

> 8.6 <u>Entire Agreement</u>.  This Agreement, including the other documents referred to herein which form a part hereof or any other written agreements that the parties enter into pursuant to or relating to the transactions contemplated by this Agreement, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and therein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.  All exhibits and schedules referred to herein and attached hereto or to be attached are incorporated herein by reference.

*2017 Agreement* at 21.  This is a fully integrated agreement.  *See Yocca*, 854 A.2d at 436 ("An integration clause which states that a writing is meant to represent the

parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution").

The next step of the parol evidence rule analysis is to determine whether the 2015 and 2017 Agreements concern the same subjects. *Yocca*, 854 A.2d at 436-37. Morphy says the 2015 Agreement "created a temporary referral arrangement" concerning ATD items. *Def.'s Mot.* at 10. It claims the 2017 Agreement in which it "purchased substantially all of [JDJ's] assets, including all customer lists, customer information, and prospect lists" and which "includes a non-competition clause" embraces the same issues as the 2015 Agreement and therefore discharges it. *Id.* JDJ counters that the 2015 and 2017 Agreements are "independent" and "collateral" because JDJ sold Morphy its ATD business in 2015 in exchange for referral fees and "the 2017 Purchase Agreement could not have included something that JDJ had already sold to Morphy in 2015." *Pl.'s Opp'n* at 10-11.

Morphy is right. The 2015 Agreement plainly established a five-year ATD referral relationship in which JDJ agreed to (1) refrain from holding ATD auctions, (2) provide Morphy with its ATD mailing list, and (3) refer any ATD consigners to Morphy. In exchange, Morphy promised to pay JDJ $250,000 and a referral fee equivalent to five percent of the aggregate hammer price of JDJ-referred items in excess $5,000,000. Thus, contrary to JDJ's argument, Morphy did not buy JDJ's ATD business under the 2015 Agreement.

The 2017 Agreement is considerably broader but concerns the same subjects. By its terms, Morphy purchased substantially all JDJ's business and assets. *2017 Agreement* at 2-6. A close reading of the 2017 Agreement reveals extensive overlap with the 2015 Agreement. There are three key areas of overlap: (1) a non-competition provision; (2) access to the ATD mailing list; and (3) a referral agreement concerning ATD consigners.

The Court turns first to the 2017 Agreement's five-year non-competition provision:

> [JDJ] will not (A) directly or indirectly compete with, or own, manage, operate or control or participate in ownership, management, operation or control of, or provide consulting services or financial resources to, or act as guarantor for, any business, firm, corporation, partnership, person, proprietorship or other entity which is engaged in activities similar to the Business (the **"Restricted Business"**) anywhere within the United States . . ..

*Id.* at 18 (emphasis in original). The 2017 Agreement defines "the Business" as "organizing and conducting public and private auctions in multiple product categories, including, but not limited to, rare firearms, lamps, glass and fine jewelry and fine arts, Asian and antiques . . . from multiple locations." *Id.* at 2. Although the 2017 Agreement couched the non-competition provision in much broader language than the 2015 Agreement, the obligation the contracts impose on JDJ's ATD business is the same. The Court therefore concludes that when JDJ agreed in the 2017 Agreement to refrain from holding any auctions for five years, JDJ necessarily agreed to refrain from holding ATD auctions.

In reaching this conclusion, the Court rejects JDJ's arguments that the 2017 Agreement's definition of "the Business" either excludes ATD auctions or is ambiguous as to whether ATD auctions fall within "the Business." In the Court's view, the 2017 Agreement is not ambiguous. It defines "the Business" as "organizing and conducting public and private actions in multiple product categories." *2017 Agreement* at 2. Although the 2017 Agreement lists specific product categories, it uses the phrase "including, but not limited to." *2017 Agreement* at 2. This is language of inclusion, not limitation. Thus, the 2017 Agreement neither expressly nor impliedly confines "the Business" to the enumerated product categories.

Another similarity between the two agreements is that they both address Morphy's right to access JDJ's ATD mailing list. Under the 2015 Agreement, Morphy essentially leased the ATD mailing list for five years. *2015 Agreement* at 3.[2] The 2017 Agreement replaced this lease arrangement with a purchase agreement. Its terms unambiguously convey "[a]ll of the goodwill of the Business" to Morphy. *2017 Agreement* at 3-4. This includes the ATD mailing list. *Id.* As the 2017 Agreement states, Morphy purchased "both in hard copy and electronic version, all customer

---

[2]    The 2015 Agreement provided:

2. <u>ATD Mailing List.</u> [JDJ] shall provide Morphy with a copy of its ATD Mailing List as of the date of this Agreement. Morphy acknowledges and agrees that the names on the Mailing List shall not become its exclusive property and that [JDJ] may maintain and use other Customer Lists that include persons who are also named in the ATD Mailing List. Morphy agrees that the ATD Mailing List and all referrals to be provided by [JDJ] in the future shall be deemed to be Confidential Information within the meaning of the party's Reciprocal Non-Disclosure Agreement executed on or about June 9, 2015 (the "NDA").

*2015 Agreement* at 3.

(buyers and consignors) lists, all customer records and data (including current activity database and all Customer Information), lists of suppliers and vendors and all records relating thereto, purchase and sales records, prospect lists, pricing and cost information . . .." *2017 Agreement* at 3. "Customer Information" expressly includes contact information for consigners and "[m]ailing lists on which each buyer is included, organized by category, such list to include, but not be limited to, mailing lists for email, brochures and mailers, catalogs and all other mailing lists." *Id.* at 3-4. The Court concludes the 2017 Agreement and 2015 Agreement both concern Morphy's rights to possess and use JDJ's ATD mailing lists.

The parties' referral arrangement is the final relevant point of overlap. The 2015 Agreement provided that JDJ would refer ATD consigners to Morphy via email and include contact and item information as received. *2015 Agreement* at 3. The 2017 Agreement provided that during the five-year period immediately following its execution, James D. Julia would, "on a timely basis, refer any and all parties and entities, who contact him related to standard consignments, and former referrals, exclusively to [Morphy]." *2017 Agreement* at 19. Regarding the referral arrangement, the Court concludes the 2017 Agreement is a later-in-time fully integrated contract concerning the same subject-matter as the 2015 Agreement.

Stepping outside the parol evidence rule's framework, JDJ claims that the parol evidence rule cannot preclude it from bringing claims for breach of the 2015 Agreement that accrued prior to the 2017 Agreement. *Pl.'s Opp'n* at 6-8. It asserts

that Morphy's motion to dismiss "conflates the legal concepts of integration and *waiver.*" *Id.* at 6. (emphasis in original).

Although JDJ's argument is admirably innovative, the Court concludes that it is barred by the parol evidence rule. As the Pennsylvania Supreme Court wrote:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca*, 854 A.2d at 436 (citation omitted).

The Court has already held that, by operation of the parol evidence rule, the 2017 Agreement superseded and discharged the 2015 Agreement. Accordingly, whether JDJ waived its rights under the 2015 Agreement is irrelevant because JDJ has no rights under a discharged contract. The integration clause states the 2017 Agreement constitutes the "entire understanding of the parties hereto with respect to the subject matter contained herein . . .." *2017 Agreement* at 21. Permitting JDJ to bring a claim for breach of the 2015 Agreement would contravene the plain language of the 2017 Agreement's integration clause. The parol evidence rule clearly prohibits such a claim. *See 1726 Cherry St. P'ship v. Bell Atl. Props.*, 653 A.2d 663, 665 (Pa. Super Ct. 1995) ("The effect of an integration clause is to make the parol evidence rule particularly applicable. Thus, the written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony nor prior written agreements, or

other writings, are admissible to explain or vary the terms of the contract") (citation omitted).

JDJ's waiver argument also lacks caselaw support. JDJ has cited no authority for the proposition that waiver doctrine permits it to circumvent the parol evidence rule. *Pl.'s Opp'n* at 6-8. The Court found none. Although JDJ cited several cases defining waiver, those cases fail to explain how that doctrine applies to these facts. *See Blue Star Corp.*, 2009 ME 101, ¶ 26, 980 A.2d at 1277 (defining waiver); *Dep't of Human Servs. v. Bell*, 1998 ME 123, ¶ 6, 711 A.2d 1292, 1295 (rejecting a claim of waiver asserted against a state agency in a child support proceeding). The Court concludes waiver doctrine does not apply in this context.

In short, JDJ may not invoke waiver doctrine to resurrect its claims under the 2015 Agreement. Pennsylvania law provides that "if parties want to be able to rely on a prior agreement when forming a new agreement containing an integration clause, they must protect themselves by incorporating the prior agreement into the new agreement." *Creative Pultrusions*, 2019 U.S. Dist. LEXIS 195668, at *14-15. Although JDJ maintains that the 2017 Agreement actually preserves its right to sue Morphy for breaches of the 2015 Agreement, the Court finds JDJ's argument unpersuasive. *Pl.'s Opp'n* at 7 (quoting *2017 Agreement* at 21). The language JDJ cites preserves the parties' claims for breach of representations, warranties, and duties articulated in the 2017 Agreement; however, it does not purport to preserve the rights under the 2015 Agreement. *See 2017 Agreement* at 21 ("The consummation of the transactions described herein by any party shall not constitute a waiver of any

known breaches of any other party's representations, warranties, obligations, agreements or covenants unless the same are expressly waived in writing"). The Court rejects JDJ's argument because the 2017 Agreement's text does not support it.

## VI. CONCLUSION

The Court concludes the 2017 Agreement is a later-in-time fully integrated agreement. The 2017 Agreement embraces the 2015 Agreement's core subjects, namely, JDJ's agreement to refrain from holding ATD auctions, Morphy's access to JDJ's ATD mailing list, and the parties' referral arrangement. Thus, under the parol evidence rule, the 2017 Agreement supersedes the 2015 Agreement and JDJ cannot state a claim against Morphy for breach of the 2015 Agreement. Therefore, the Court grants Morphy's motion to dismiss and dismisses JDJ's Amended Complaint without prejudice.

Accordingly, the Court GRANTS Dan Morphy Auctions, LLC's Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim (ECF No. 15) and DISMISSES without prejudice James D. Julia, Inc.'s Amended Complaint (ECF No. 12).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of June, 2021.